UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| ATM FINANCIAL SERVICES, LLC, | ) | Case No.  6:08-bk-969-KSJ |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| | | |
| SONEET R. KAPILA, Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | Adversary No. 6:10-ap-44 |
| vs. | ) | |
| | ) | |
| PHILLIPS BUICK-PONTIAC-GMC | ) | |
| TRUCK, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION PARTIALLY GRANTING AND PARTIALLY DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

The Chapter 7 trustee, Soneet Kapila, seeks  to avoid multiple fraudulent transfers made by the debtor, ATM Financial Services, LLC, to defendant, Phillips Buick-Pontiac-GMC Truck, Inc., in payment for vehicles the debtor never owned or possessed.  Both parties now move for complete or partial summary judgment on numerous grounds.[1]  The Court partially grants the trustee's motion, finding the debtor was engaged in a Ponzi scheme and was insolvent at the time of the transfers but that the trustee may not yet rely on the Ponzi scheme presumption of fraudulent intent. The Court denies *in toto* the defendant's cross motion for summary judgment.

The debtor claimed to engage in the business of selling, managing, and servicing thousands of automated teller machines (ATMs) placed in retail locations around the country.  In reality, the

---

[1] Relevant pleadings include: Trustee's Motion for Partial Summary Judgment (Doc. No. 30); Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Partial Summary Judgment (Doc. No. 49) (treated as cross motion for summary judgment); Plaintiff's Reply to Defendant's Memorandum of Law (Doc. No. 53); Plaintiff's Response to Defendant's Cross Motion for Summary Judgment (Doc. No. 60); Defendant's Reply to Plaintiff's Response (Doc. No. 64).

debtor operated a vast fraudulent scheme between 2004 and 2008.  The debtor's principal, Vance Moore, II, and his co-conspirator Walter Netschi duped people into purchasing ATMs that either never existed or never were owned by the conspirators.  Purchasers typically "bought" ATMs from the debtor or from separate companies owned by Netschi—36 Main Street, LLC, Second Main Street, LLC,[2] and ATM Capital, Inc. (the "Netschi Companies").   Purchasers then would sign an equipment management agreement with the debtor to service the ATMs.

The debtor promised to remit a percentage of the withdrawal fees collected from the ATMs to the owner.  These agreements, however, were a fiction.  Because the ATMs largely never existed, the debtor never truly earned withdrawal fees.  Rather the debtor paid the fictitious "withdrawal fees" using cash invested by new purchasers.  By 2009, when federal prosecutors indicted Netschi and Moore, the two had defrauded "purchasers" of over $80 million.  Both Netschi and Moore currently are serving eight year prison terms after being convicted in the United States District Court for the Southern District of New York of nine counts of wire fraud and one count of wire fraud conspiracy in connection with their fraudulent ATM investment scheme.

As to the debtor's role in the scheme, the trustee's affidavit states that in the four-year period from February 12, 2004, to February 12, 2008 (the petition date), the debtor received only $3.7 million in withdrawal fees from the legitimate operation and servicing of ATMs, yet paid ATM owners $32.8 million in purported fees.[3]  The trustee avers the debtor falsified monthly earnings reports to owners, claiming their machines earned $200-500 per month in fees, based on attachments to proofs of claim filed in this bankruptcy case.  Even assuming *every* machine earned $500 per month every month, the debtor would have had to service more than 1,350 machines per month over the four-year period in order to account for the debtor's net payouts of $32.8 million. Yet, only approximately 424 ATMs actually were maintained by the debtor.[4]

---

[2] The trustee alleges the debtor's principal, Vance Moore, had signatory authority over bank accounts in the name of 36 Main Street and Second Main Street.  *Kapila Affidavit,* ¶ 9.b. (Doc. No. 30, Ex. A).
[3] *Kapila Affidavit,* ¶ 8.
[4] *Kapila Affidavit,* ¶ 11.

Because the debtor actually serviced far fewer ATMs than the number of ATMs it claimed to service, the debtor plainly could not keep up the charade of remitting fees to ATM owners with actual withdrawal fees alone. Thus, to perpetuate the scheme the debtor used "new money" from new ATM purchasers. Based on the trustee's review of the debtor's bank statements, the debtor used (1) $2.3 million from new "sales" of ATM machines made by the debtor, which ATMs the trustee has been unable to verify actually existed or were actually delivered, (2) $36.2 million the debtor received from the Netschi Companies,[5] which undoubtedly was money derived from ATM "sales," (3) $4.1 million from other entities controlled by the debtor's principal, Vance Moore, and (4) $2.2 million in cash from unidentifiable sources.[6] Eventually, of course, the debtor fell behind in payments to owners, who started asking questions, and the scheme unraveled.

On February 10, 2008, the debtor filed this Chapter 11 bankruptcy case, and on June 20, 2008, the case was converted to a Chapter 7 proceeding. On February 8, 2010, the trustee filed this adversary proceeding to avoid transfers made to the defendant, Phillips Buick-Pontiac-GMC Truck, Inc., during the four-year period prior to the petition date. The trustee raises claims of both actual fraudulent transfer and constructive fraudulent transfer under §§ 544(b), 548, and 550(a) of the Bankruptcy Code and the similar state statutes, Fla. Stat. §§ 726.105(1)(a), (b), and 726.108.

The four transfers the trustee seeks to avoid were transfers made in payment for six vehicles.[7] In 2006-2007, while the debtor's fraudulent scheme was ongoing, the debtor transferred approximately $292,752.86 in the aggregate to the defendant for payment of vehicles that

---

[5] The trustee states the debtor received $33,276,182 from 36 Main Street; $1,412,500 from Second Main Street; and $1,448,330 from ATM Capital, Inc. *Kapila Affidavit*, ¶ 9.b.

[6] *Kapila Affidavit*, ¶¶ 7-12.

[7] The trustee's pleadings are inconsistent on the number and amount of transfers he is actually trying to avoid. The trustee's complaint (Doc. No. 1), amended complaint (Doc. No. 6), motion for partial summary judgment (Doc. No. 30), reply to defendant's memorandum of law (Doc. No. 53), and response to defendant's cross motion for summary judgment (Doc. No. 60), refer to different numbers and total amounts of transfers sought to be avoided. Specifically, one transfer in the amount of $10,300 completed on March 17, 2004, is included in the amended complaint but not addressed in the trustee's recent pleadings (Doc. Nos. 53 and 60). The inclusion or exclusion of this one transfer does not affect the ruling on the pending motions for summary judgment; however, at the next pretrial conference, the Court would ask the trustee to confirm if he is still seeking to recover this earlier transfer of $10,300.

undisputedly were never titled in the debtor's name.  A related entity owned by Moore, Best Lab Deals, Inc., received title to five vehicles, and Moore's wife, Darcy Jo Moore, received title to one. Specifically, the transfers at issue are as follows:

| Date | Method | Amount | VIN | Title Name |
|------|--------|--------|-----|------------|
| 07/18/2006 | Wire Transfer | $52,519.17 | 1573 | Best Lab Deals, Inc. |
| 07/20/2006 | Wire Transfer | $53,412.77 | 1552 | Best Lab Deals, Inc. |
| 08/24/2006 | Check 37390 | $22,808.93 | 6224 | Darcy Jo Moore |
| 01/02/2007 | Wire Transfer | $164,011.99 | 5632, 7365, 9761 | Best Lab Deals, Inc. |

The trustee alleges these transfers were fraudulent on two separate grounds.  First, he characterizes the debtor's scheme as a Ponzi scheme and accordingly relies on the so-called Ponzi scheme presumption to establish that the debtor had the requisite actual fraudulent intent to hinder, delay, or defraud creditors in making the transfers.  Second, because the recipient of the vehicles was not the debtor, the trustee alleges the debtor received no value in exchange for the transfers to the defendant and thus argues the transfers were "wrong payor" constructively fraudulent transfers.

The trustee has moved for partial summary judgment on four discrete issues.  First, the trustee seeks a finding that the debtor ran a Ponzi scheme and that the Ponzi scheme presumption applies to the transfers in this case.  Similarly, the trustee seeks a finding that, because the debtor ran a Ponzi scheme, the debtor was by definition (1) insolvent, (2) operating with an unreasonably small capital, and (3) intending to incur debts beyond its ability to repay.

The defendant really does not contest the trustee's motion, other than contending he is not entitled to rely on the Ponzi scheme presumption, but in its memorandum of law in opposition to the trustee's motion,[8] the defendant requested final summary judgment in its favor on various affirmative defenses.  In response, the trustee filed a reply only as to the issues within the scope of his motion for partial summary judgment (i.e. the Ponzi scheme presumption and insolvency issues)

---

[8] Doc. No. 49.

and requested a separate briefing schedule on the defendant's other defenses.[9]  At a hearing on

February 24, 2011, the parties discussed the scope of the defendant's response memorandum, and

the Court treated the response as a cross motion for summary judgment and issued a briefing

schedule on the additional issues raised therein.[10]

In opposing the trustee's motion for partial summary judgment, the defendant argues that

the trustee may not rely on the Ponzi scheme presumption.  First, the defendant asserts that the

debtor's fraudulent activities do not meet the classic definition of a Ponzi scheme because the

debtor's victims were not "investors" and the trustee has not shown the debtor used new

investments to pay investors.  Second, the defendant asserts that, in order to find a Ponzi scheme,

the Court must consider the debtor and the Netschi Companies as a single economic unit.

In seeking cross summary judgment on its own behalf, the defendant raises four defenses

that, if accepted, would result in summary judgment in its favor.  First, under an "earmarking"

theory, the defendant argues that the transferred funds are not subject to avoidance because the

monies belonged to the Netschi Companies and were not property of the debtor.  Second, the

defendant argues the debtor received reasonably equivalent value for the transfers, which defeats the

trustee's constructive fraud claims and establishes the defendant's good faith defense under Fla.

Stat. § 726.105 and § 548(c) of the Bankruptcy Code.  Third, defendant argues that the trustee

already received payment in connection with a settlement with Best Lab Deals, Inc., and further

prosecution of the avoidance claims violates the single satisfaction rule under § 550(d) of the

Bankruptcy Code.  Fourth, the defendant argues that, as a result of Vance Moore's guilty plea and

the related forfeiture judgment, the trustee lacks standing because the U.S. Government has a

superior right to the disputed funds.

---

[9] Doc. No. 53.

[10] In accordance with this directive, the trustee filed his Response to Defendant's Cross Motion for Summary
Judgment (Doc. No. 60), and defendant filed its Reply to Plaintiff's Response (Doc. No. 64).

Under Federal Rule of Civil Procedure 56, made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7056, a court may grant summary judgment where "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."[11]   The moving party has the burden of establishing the right to summary judgment.[12]   In determining entitlement to summary judgment, a court must view all evidence and make all reasonable inferences in favor of the party opposing the motion.[13]   "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."[14]   A material factual dispute thus precludes summary judgment.[15]

### The debtor operated a Ponzi scheme and was insolvent, but the trustee cannot yet rely on the Ponzi scheme presumption.

To prevail on his actual fraudulent transfer claim under § 548(a)(1)(A) of the Bankruptcy Code and Fla. Stat. § 726.105(1)(a), the trustee must establish: (1) the debtor "transferred an interest in property" within the relevant pre-petition time period, and (2) the debtor made such transfer with actual intent to hinder, delay, or defraud any creditor.   Given the difficulty of establishing a transferor's actual intent, courts generally look at the totality of the circumstances and the badges of fraud surrounding the transfers to establish the requisite intent.[16]   But in cases involving a Ponzi scheme, courts typically infer fraudulent intent because, as this Court has previously stated, "[a] Ponzi scheme is by definition fraudulent."[17]   For that reason, "any acts taken in furtherance of [a] Ponzi scheme…are also fraudulent.   Every payment made by the debtor to keep the scheme on-going [is] made with actual intent to hinder, delay, or defraud

---

[11] Fed. R. Civ. P. 56.
[12] *Fitzpatrick v. Schlitz (In re Schlitz)*, 97 B.R. 671, 672 (Bankr. N.D. Ga. 1986).
[13] *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (*citing Dibrell Bros. Int'l S.A. v. Banca Nazionale Del Lavaro*, 38 F.3d 1571, 1578 (11th Cir. 1994)).
[14] *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 572, 587 (1986).
[15] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[16] *Cuthill v. Greenmark (In re World Vision Entertainment, Inc.)*, 275 B.R. 641, 656 (Bankr. M.D. Fla. 2002).
[17] *Id.*; *see also Wiand v. Waxenberg*, 611 F.Supp.2d 1299, 1312 (M.D. Fla. 2009); *In re Old Naples Securities, Inc.*, 343 B.R. 310, 319-20 (Bankr. M.D. Fla. 2006); *In re McCarn's Allstate Finance, Inc.*, 326 B.R. 843, 849-52 (Bankr. M.D. Fla. 2005).

creditors, primarily the new investors."[18] Therefore, in this adversary proceeding, the trustee can establish the debtor's actual fraudulent intent by showing the transfers to the defendant were "in furtherance of" a Ponzi scheme.[19]

A Ponzi scheme generally is defined as a "phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors."[20] In order to prove the existence of a Ponzi scheme, the trustee must establish that: (1) deposits were made by investors; (2) the debtors conducted little or no legitimate business operations as represented to investors; (3) the purported business operations of the debtors produced little or no profits or earnings; and (4) the source of payments to investors was from cash infused by new investors.[21]

All of the hallmarks of a classic Ponzi scheme are present here. The debtor and the Netschi Companies conned people into making a purchase they believed would generate a future income stream based on the perpetrators' misrepresentations about the amount of withdrawal fees each ATM could earn. The ATM purchasers were therefore no different from investors hoping to make above market returns based on phony investments, and the monies they transferred to the debtor and the Netschi Companies were functionally equivalent to investments. The debtor also conducted very little legitimate business in comparison with the number of non-existent ATMs sold to investors. As such, the debtor created completely false and artificially high earnings statements. Only 424 ATMs existed, while the debtor and the Netschi Companies "sold" and "serviced"

---

[18] *World Vision*, 275 B.R. at 656.

[19] The trustee's motion misstates the law regarding the Ponzi scheme presumption by stating *any* transfer made by a debtor involved in a Ponzi scheme is necessarily made with the requisite fraudulent intent. As this Court has previously stated, only when a transfer is shown to have been made "in furtherance of" a Ponzi scheme will the debtor's fraudulent intent be established. *Kapila v. Integra Bank, N.A. (In re Pearlman)*, 440 B.R. 569, 575 (Bankr. M.D. Fla. 2010) (Jennemann, J.). The Ponzi scheme presumption arose out of avoidance actions against investors in a Ponzi scheme for the return of monies received above the amount invested, where such a presumption makes sense: payments to previous investors with "new money" perpetuates the fraud by lending legitimacy to the whole scheme. When the transfer at issue was *not* made to Ponzi scheme investors, it is less clear the presumption applies, and the movant must show the transfer somehow perpetuated or was "in furtherance of" the Ponzi scheme.

[20] *United States v. Silvestri*, 409 F.3d 1311, 1317 n. 6 (11th Cir. 2005).

[21] *Wiand*, 611 F.Supp.2d at 1312.

approximately 3,200 ATMs.[22]   Because the debtor serviced very few actual ATMs, the debtor's legitimate operations produced no profit or earnings.   The debtor obtained merely $6 million from servicing revenue and new "sales" of ATM machines, yet paid out approximately $36.1 million in fictional withdrawal fees to ATM owners.[23]

Moreover, the debtor necessarily made nearly all of the payouts to initial ATM "owners" with money fraudulently obtained, at least in majority, from other later ATM purchasers.   The Court has no doubt, based on the admissions and pleadings filed in the criminal prosecution of Netschi and Moore[24] and the trustee's affidavit, that the only possible source of the approximately $36.2 million the Netschi Companies transferred to the debtor was from fraudulent ATM sales.   There is no evidence these companies had *any* legitimate business activity aside from the few sales they made of a few physical ATMs.   The inescapable conclusion based on the facts presented by the trustee is therefore that the debtor necessarily relied almost exclusively on new sales—whether made by the debtor or the Netschi Companies—to make payments to ATM owners who thought they were receiving withdrawal fees.

The defendant has not provided *any* factual material to rebut the evidence that the debtor operated as a Ponzi scheme.   The defendant's only arguments are that the scheme did not involve "investors" and that there is a question of fact as to whether the Netschi Companies should be considered co-conspirators with the debtor or a single "economic unit."   As explained above, the ATM purchasers were functionally equivalent to investors because they hoped to earn future income from withdrawal fees based on the debtor's false representations.   And whether the Netschi Companies should be considered co-conspirators with the debtor or "an economic unit" is irrelevant.   The question raised by the trustee's motion for summary judgment is whether the debtor

---

[22] Doc. No. 53, p. 9.
[23] *Kapila Affidavit*, ¶¶ 7-12.
[24] CD ROM of criminal proceedings attached as an Appendix to Doc. No. 53.

took acts in furtherance of a Ponzi scheme, and the clear answer is yes.  The debtor was an integral part of and conspired to run a Ponzi scheme.

Finding the debtor took acts in furtherance of a Ponzi scheme, however, does not automatically entitle the trustee to rely upon the Ponzi scheme presumption.  To establish the debtor's fraudulent intent with regard to the specific transfers at issue in this case, the trustee must show that *each transfer* was made *in furtherance of* the Ponzi scheme.  The reason for this is clear: the Court can only infer intent to defraud future purchasers when the trustee has shown the transfers at issue somehow perpetuated the debtor's Ponzi scheme.  Transfers made by the debtor unrelated to the Ponzi scheme do not warrant this inference.

Here, the trustee has not yet shown the car purchases from the defendant were made in furtherance of the Ponzi scheme.  The car purchases appear to be transfers to insiders with the use of cash obtained through the debtor's fraudulent scheme, in which case the Court strains to see how such transfers could have perpetuated the debtor's scheme.  This is not to say the transfers might not have been fraudulent, just that the trustee has not yet established why the Court should apply the Ponzi scheme presumption to the specific transfers in this case (i.e. transfers to a car dealer for cars ultimately titled to Moore's wife and another company owned by Moore).  The Ponzi scheme presumption must have some limitations, lest it swallow every transfer made by a debtor, whether or not such transfer has anything to do with the debtor's Ponzi scheme.  Therefore, even though the Court will find that the debtor operated a Ponzi scheme, the Court will not go further to allow the trustee to rely on the Ponzi scheme presumption simply because he has not yet proven the transfers at issue were made in furtherance of the debtor's Ponzi scheme.

The trustee next seeks to use the fact of the debtor's Ponzi scheme to establish the debtor's insolvency during the four-year period prior to the petition date in connection with his constructive

fraudulent transfer claims.[25]  There is little debate that a company run as a Ponzi scheme is insolvent

as a matter of law.[26]  The debtor's scheme in this case exemplifies why.  The debtor defrauded

numerous ATM purchasers by either selling non-existent ATMs or entering into equipment

management agreements for non-existent ATMs.  Every subsequent fictitious ATM "sale" or

management agreement added further obligations on the debtor to remit ATM withdrawal fees for

which there was no source of legitimate cash.  Moreover, as pointed out by the Seventh Circuit

Court of Appeals in *Scholes v. Lehman*,[27] every defrauded ATM purchaser became a tort creditor of

the debtor for the fraudulent ATM purchases, further adding to the debtor's liabilities.  Thus, every

"sale" only worsened the debtor's ability to repay purchasers because the pool of owners entitled to

payment kept growing.  In this way, Ponzi schemes, like the debtor's, are perpetual insolvency

machines.  Accordingly, the Court finds that because the debtor was running a Ponzi scheme from

2004 to the petition date, the debtor was insolvent at all relevant times.

Because under § 548(a)(1)(B)(ii) of the Bankruptcy Code and the similar Florida

constructive fraud statute, the trustee need only show (I) the debtor was insolvent *or* (II) was

engaged in business with unreasonably small capital *or* (III) intended to incur debts beyond its

ability to repay, the trustee has established one of the essential elements of his constructive

fraudulent transfer claims by establishing the debtor's insolvency.  Nonetheless, apparently pleading

in the alternative, the trustee also seeks summary judgment on prongs (II) and (III).

---

[25] Section 548(a)(1)(B) of the Bankruptcy Code provides that a transfer is constructively fraudulent when: (1) the debtor "transferred an interest in property," (2) the debtor received "less than a reasonably equivalent value" in exchange for such transfer, and (3)(i) the debtor was insolvent on the date that such transfer was made or such obligation was incurred, (ii) was engaged in business with an unreasonably small amount of capital, (iii) intended to incur debts beyond the debtor's ability to pay such debts, or (iv) made such transfer to or for the benefit of an insider of the debtor outside of the ordinary course of business.

[26] *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) ("a Ponzi scheme…is, as a matter of law, insolvent from its inception."); *Scholes v. Lehman*, 56 F.3d 750, 755 (7th Cir. 1995) (stating that because "defrauded investors…are tort creditors," corporations run as a Ponzi scheme "were insolvent from the outset and could have been petitioned into bankruptcy."); *Daley v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480, 486 n. 17 (D. Conn. 2002) ("a number of courts have held that an enterprise engaged in a Ponzi scheme is insolvent from its inception and becomes increasingly insolvent as the scheme progresses."); *In re Financial Federated Title & Trust, Inc.*, 309 F.3d 1325, 1332 (Fla. 2002) ("By definition, a Ponzi scheme is driven further into insolvency with each transaction.").

[27] 56 F.3d at 755.

For the same reasons a Ponzi scheme debtor is by definition insolvent, many courts hold that proof of a debtor's operation of a Ponzi scheme is sufficient to establish the debtor was engaged in business with unreasonably small capital and that the debtor intended to incur debts beyond its ability to repay.[28]  Again, this makes sense here.  The only "capital" the debtor had was money taken from defrauded purchasers expecting future monthly payments of withdrawal fees the debtor had no way of supplying except by "selling" even more non-existent ATMs.  This is demonstrated most clearly by the fact that the debtor required $36.2 million from the Netschi Companies (which sold most of the ATMs) to make $32 million in payments to ATM owners for purported withdrawal fees.  Likewise, every new "sale" or contract the debtor entered into was a debt the debtor incurred at a time when it must have known it had no ability to repay such additional future obligations other than by duping more investors.  Therefore, in summary, the Court will partially grant the trustee's motion for summary judgment finding the debtor operated a Ponzi scheme for the four years preceding the filing of this case, and that, during this time, the debtor was insolvent, engaged in business with unreasonably small capital, and intended to incur debts beyond its ability to repay. The Court denies the trustee's motion to the extent he seeks to rely on the Ponzi scheme presumption without proving the specific transfers in question in this adversary proceeding were made "in furtherance of" the Ponzi scheme.

### **Defendant is not entitled to summary judgment on any ground.**

The defendant has presented four separate grounds for summary judgment.  Each fails.

**Earmarking Doctrine Not Proven**.  Initially, defendant argues the funds transferred from the debtor cannot be avoided because they were not "an interest of the debtor in property" under §

---

[28] *Donell v. Kowell*, 533 F.3d 762, 770-71 (9th Cir. 2008); *In re C.F. Foods, L.P.*, 280 B.R. 103, 116-17 (Bankr. E.D. Pa. 2002) (operation of a Ponzi scheme shows debtor's subjective intent to incur debts beyond the debtor's ability to pay as they became due); 232 B.R. 915, 919 (Bankr. S.D. Ohio 1998) ("While the Debtor's intent to incur debts that were beyond its ability to pay is not known specifically, it can be inferred as a result of the debtor's continuous insolvency and operation of a Ponzi scheme."); *Emerson v. Maples (In re Mark Benskin & Co.)*, 161 B.R. 644, 650 (Bankr. W.D. Tenn. 1993) (where debtor operated primarily on "fraudulently obtained funds…[i]t would seem axiomatic that the debtor was operating its business with unreasonably small capital.").

548(a)(1). Rather, the monies were paid by the Netschi Companies specifically to allow the debtor to buy the vehicles at issue. The defendant's earmarking argument has two forms. First, as to the vehicles titled in Best Lab Deals' name, the defendant argues the debtor was a "mere conduit" through which Netschi (through 36 Main Street) paid with funds earmarked for the purchase of vehicles Netschi ultimately received and controlled. Second, again relying on the "mere conduit" test, the defendant argues more broadly that *none* of the money transferred to the debtor by the Netschi Companies constitutes property of the estate because Netschi maintained such control over the funds that they never truly were under the debtor's control.

Under Eleventh Circuit Court of Appeals precedent, courts should not presume the debtor's control of funds where a transfer to a non-creditor is challenged as fraudulent from the simple fact that "a third party placed the [transferred] funds in an account of the debtor with no express restrictions on their use."[29] The Eleventh Circuit's recent opinion in *Martinez v. Hutton (In re Harwell)* makes clear that a party lacks control when it "merely served as a conduit for the assets that were under the actual control of the…transferor."[30] The Bankruptcy Court for the Southern District of Florida has also elaborated on control, stating "control has two components: first, the power to designate which party will receive the funds; and, second, the power to actually disburse the funds at issue to that party. In other words, control means control over identifying the payee, and control over whether the payee will actually be paid."[31]

Defendant first relies on the "earmarking doctrine" to argue that the debtor received the funds from 36 Main Street for the sole and express purpose of buying the vehicles as directed by the Netschi Companies.[32] According to the defendant, the debtor was a mere conduit who received the

---

[29] *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177, 1181-82 (11th Cir. 1987).
[30] 628 F.3d 1312, 1323 (11th Cir. 2010).
[31] *In re Bankest Capital Corp.*, 2007 WL 2288145 at *4 (Bankr. S.D. Fla., Aug. 7, 2007).
[32] The defendant relies exclusively on *Cooper v. Centar Investments Ltd. (In re Trigem America Corp.)*, 431 B.R. 855 (Bankr. C.D. Cal. 2010) in support of its earmarking argument, citing no case law within the Eleventh Circuit. No doubt this is because the Eleventh Circuit Court of Appeals has never expressly adopted the earmarking doctrine. *Bank of America, N.A., v. Mukamai (In re Egidi)*, 571 F.3d 1156, 1162 (11th Cir. 2009).

funds with "earmarked" instructions to buy the cars. Certainly, some courts, although not the Eleventh Circuit Court of Appeals, have applied the earmarking doctrine in preferential transfer actions under § 547 of the Bankruptcy Code where "a third party makes a loan to a debtor so that the debtor is able to satisfy the claim of a designated creditor."[33] In such circumstances courts have found the funds transferred never become property of the debtor's estate and that "no preference is created."[34] But the Eleventh Circuit Court of Appeals has not adopted the earmarking doctrine in any context and there is scant support for it in reported bankruptcy court decisions within this circuit.[35]

Regardless of the viability of the earmarking doctrine within the Eleventh Circuit, the defendant fails to show why the doctrine should apply in this adversary proceeding. Defendant's primary evidence in support of the earmarking doctrine is the fact that 36 Main Street transferred significant sums to the debtor before and after the debtor purchased cars from the defendant. Specifically, within a week prior to two of the transfers at issue, on July 14, 2006, 36 Main Street transferred $830,000 to the debtor; and again, 11 days *after* another significant transfer of funds to the defendant, on December 29, 2006, the debtor received $300,000 from 36 Main Street. But, as the trustee points out, 36 Main Street transferred approximately $35 million to the debtor between March 2006 and February 2008 over the course of 46 separate deposits that averaged exactly two deposits per month. The defendant could therefore pick *any* transfer made by the debtor and argue it used funds from 36 Main Street earmarked for the transfer. Moreover, the amount of the transfers from 36 Main Street bears absolutely no relation to the amount of the transfers the debtor made to the defendant (i.e. $830,000 v. $105,931.99 and $300,000 v. $164,011.99).

Defendant also tries to establish its earmarking argument with Moore's deposition testimony that Netschi directed him to purchase the vehicles with the transferred funds, and further argues that

---

[33] *Egidi*, 571 F.3d at 1162.
[34] *Id.*
[35] *Id.*

the sale and title documents for the five vehicles show Netschi or his relatives ultimately took possession of the vehicles.[36]   Moore's testimony that Netschi requested he purchase the vehicles on his behalf provides some corroborating evidence of an earmarking situation, as do the sale documents indicating that the five vehicles were shipped to Texas.   But they do not establish who actually took possession of the vehicles.   Of course, the vehicles were never titled in Netschi's name or in the name of his children.   Rather, the vehicles were titled in the name of Mr. Moore's wife and Best Lab Deals.

In sum, these circumstantial facts, even if accepted, are not enough to meet defendant's burden on summary judgment to show no rational fact-finder could possibly find the debtor *did* have control and that Netschi *did not* earmark the funds 36 Main Street transferred to debtor. Assuming the earmarking doctrine is viable within the Eleventh Circuit, the defendant still must prove that specific funds were actually earmarked by Netschi and that the debtor had *no control* over such funds.   In other words, the defendant must establish much more than simply that Moore followed Netschi's instructions or did him a favor; it must establish that Moore/the debtor had no authority or control over the funds Netschi transferred to the debtor.

Similarly, the defendant has failed to establish that Netschi at all times controlled the funds the Netschi Companies transferred to the debtor.   The defendant's second earmarking theory in essence is that Moore and the debtor were under Netschi's complete and hypnotic power and control, and apparently thus were mere pawns, not co-conspirators, in Netschi's scheme.   Defendant relies on the fact that the Netschi Companies transferred $36 million to the debtor as evidence that Netschi controlled the debtor.   The fact that the debtor relied heavily on money from the Netschi

---

[36] Defendant argues Ex. D of Plaintiff's Response (Doc. No. 60) shows the shipping address for one of the vehicles was to Mr. Netschi's daughter, Danielle Jones, and that Ex. E of Plaintiff's Response shows the shipping address of another vehicle was to Mr. Netschi's son, Jason Netschi.   These documents, however, show that Best Lab Deals was the purchaser and, in a hand written note, simply state "went to" the aforementioned names.   Defendant further has attached documentation to its Reply purporting to show three other vehicles were shipped to Texas (Exs. B, C, and D of Doc. No. 64).   Again, these documents show Best Lab Deals purchased these vehicles and that they may have been shipped to Texas.   But the ultimate recipient is unclear.   None of these documents establishes Netschi was the actual recipient.

Companies to keep its fraud going says little about whether Netschi controlled the debtor.  In fact, the *opposite* conclusion—that Moore and the debtor controlled *Netschi's* cash—is equally consistent.  Therefore, because there are many material questions of disputed fact about the degree of Netschi's control over the debtor's funds and whether such funds were earmarked for specific purchases, the Court denies the defendant's motion for summary judgment on the earmarking theory that the funds never were property of the debtor.

**Defendant has failed to show the debtor received reasonably equivalent value**.  The defendant next argues that the debtor received reasonably equivalent value in exchange for the transfers.  Reasonably equivalent value is an essential element both of the trustee's constructive fraudulent transfer claims under § 548(a)(1)(B) of the Bankruptcy Code and of the defendant's good faith defense under § 548(c).[37]  Thus, if the defendant can establish the debtor received reasonably equivalent value in exchange for the subject transfers, the defendant would be entitled to summary judgment on the constructive fraudulent transfer claims and will have established a necessary element of its good faith defense to the trustee's actual fraudulent transfer claims.  The defendant's first argument that the debtor received reasonably equivalent value is that the debtor took "equitable ownership" of the vehicles and then titled them into Best Lab Deals' name.  Defendant then argues that, with regard to the vehicle titled in Mrs. Moore's name, the debtor paid for the vehicle on Mrs. Moore's behalf in partial repayment of a preexisting debt.

As to the "equitable ownership" theory, the defendant has presented almost no evidence to support this theory, and in fact has provided evidence *to the contrary*.  As set forth above, defendant argues *Netschi and his relatives in Texas* received the vehicles directly.  Yet here defendant argues the debtor had some equitable ownership over the vehicles.  Adding further confusion, the vehicles were titled in Best Lab Deals' name.  Because the facts as pled cast significant doubt on whether the

---

[37] Under § 548(c), a transferee who "takes for value and in good faith" may retain any interest transferred "to the extent that such transferee or obligee gave value *to the debtor* in exchange for such transfer."

debtor ever had any "equitable ownership" over the vehicles, defendant's motion for summary judgment on this basis is denied.

The defendant's second argument that the debtor received reasonably equivalent value is that the $22,808.93 paid by the debtor to buy Mrs. Moore a car was really a repayment of the debtor's pre-existing loan from Mrs. Moore.   Again, however, the defendant has not provided enough evidence for the Court to conclude that this car purchase was a repayment by the debtor on any such insider loan.  Mrs. Moore's affidavit and the exhibits attached state she loaned the debtor $75,000 in 2003, and $100,000 in 2004.[38]  She further avers that the debtor paid $22,808.93 of the $54,687 purchase price of a new vehicle purchased from defendant in August 2006, and that such payment was made in partial repayment of the money owed to her by the debtor for the loan amount outstanding at that time.  She also states that on June 23, 2008, she was given relief from the automatic stay by this Court to repossess certain vehicles pledged as security for the promissory notes.[39]   Finally, Mrs. Moore indicates that the $75,000 note has been paid off in full,[40] and calculates the balance due under the $100,000 note to be currently $63,221.07, but gives no explanation or accounting for this number.

The trustee has raised a question of fact as to whether the debtor's outstanding principal amount on the loans (if actually made) was actually reduced by the $22,808.93 transfer.  In short, he argues Mrs. Moore's accounting is either inaccurate or incomplete, and in any event that there is no indication Mrs. Moore actually reduced the debtor's outstanding loan obligation in exchange for the $22,808.93 transferred to the defendant.  The trustee points out the fact that Exhibit D to Mrs. Moore's affidavit, which appears to be an email with an accounting of the $100,000 loan from Mrs. Moore as of May 16, 2008, shows the debtor made payments of principal and interest in the

---

[38] Affidavit of Darcy Jo Moore, Ex. A to Doc. No. 49-1, and promissory notes attached as exhibits thereto.
[39] Order Granting Motion for Relief From Stay (Doc. No. 249).
[40] Mrs. Moore does not state this loan was repaid, but an accounting attached to her affidavit purports to show it was repaid in full and the only outstanding balance she has sought to recoup in this bankruptcy proceeding is the balance on the $100,000 note.

aggregate amount of $73,670, and that the then outstanding balance was $58,715, which is in line with her previous motion for relief from stay.[41]   However, the accounting does *not* reflect any payment made by the debtor to Mrs. Moore in the amount of $22,808.93 on or about August 6, 2006.   Nor does this accounting reflect another transfer in 2004 to the defendant on behalf of Mrs. Moore in the amount of $10,300 in connection with another vehicle purchase.   Moreover, Mrs. Moore's accounting has not factored in the apparently conceded value of the vehicles that were the subject of her motion for relief, $33,780.   Using Mrs. Moore's latest outstanding balance figure ($63,221.07) and subtracting from this amount the value of all vehicles she's received and the debtor's payments to the defendant for vehicles she's received ($66,888.93), it appears she *owes* the debtor money ($3,667.86).   In sum, given the apparently incomplete accounting, the Court cannot conclude on Mrs. Moore's affidavit alone that she in fact reduced the debtor's outstanding loan balance in connection with the transfer from the debtor to the defendant in the amount of $22,808.93.   Because genuine issues of fact remain, the Court will deny defendant's motion for summary judgment on its reasonably equivalent value arguments.

**Trustee's settlement with Best Lab Deals does not prevent Trustee from seeking to avoid transfers in this adversary proceeding**.   Defendant next argues the trustee's action violates the single satisfaction rule under § 550(d) of the Bankruptcy Code with respect to the Best Lab Deals vehicles.   Under that section, "[t]he trustee is entitled to only a single satisfaction under subsection (a) of [§ 550]."   Section 550(a) provides the trustee may recover the value of the property avoided by the trustee under §§ 544 or 548, among other sections.   The defendant's argument is that the trustee's settlement with Best Lab Deals in adversary proceeding 6:08-ap-237-KSJ for $3,500,000 included settlement of Best Lab's receipt of the vehicles purchased by the debtor that are the subject of this adversary proceeding.   Therefore, according to the defendant, the trustee

---

[41] Doc. No. 214.

cannot now also recover the monies paid by the debtor to defendant for the vehicles received by Best Lab.

The defendant is mistaken that the trustee's compromise with Best Lab Deals involved the vehicles at issue in this adversary proceeding titled in Best Lab's name. A cursory review of the trustee's amended complaint against Best Lab Deals shows that the only transfers the trustee sought to avoid and eventually settled were transfers of monies between February 2006 and February 2008 in the aggregate amount of $7,456,640.[42] The spreadsheet attached to the amended complaint as Exhibit A shows that *every* transfer sought to be avoided was either a bank deposit or a wire transfer from the debtor to Best Lab Deals. The spreadsheet does *not* include any vehicles (or their value) and the defendant has provided no evidence that the value of such vehicles was in fact included in the settlement with Best Lab. Therefore, there is no overlap in the funds sought to be avoided in this case and the transfers at issue in the Best Lab Deals adversary proceeding. The trustee will not receive a double recovery if he is successful in this adversary proceeding, and the defendant's motion for summary judgment on this basis is denied.

**Trustee has Standing**. Finally, the defendant argues the trustee is no longer the proper party, or lacks standing, to pursue the disputed funds after a $50 million forfeiture judgment was entered against the debtor's principal, Vance Moore. On October 18, 2010, the United States District Court for the Southern District of New York entered a Preliminary Forfeiture Order in the criminal proceeding then pending against Moore.[43] The forfeiture order provides for a $50 million forfeiture judgment against Moore and provides that all of Moore's right, title and interest in two specific parcels of real property are forfeited to the United States with their values to be applied toward partial satisfaction of the $50 million judgment.[44] The preliminary forfeiture order further

---

[42] Doc. No. 11 in case no. 6:08-ap-237-KSJ.
[43] *United States v. Vance Moore II*, Case No. 1:09-cr-00881-TPG-1 (S.D.N.Y. 2010).
[44] Preliminary Forfeiture Order at pp. 2-4.

directs the United States Marshals Service to seize and secure the two specified parcels of real property and to dispose of them pursuant to 21 U.S.C. § 853(n).[45]

The recital to the forfeiture order further describes the forfeiture judgment as "representing all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in the Indictment."[46]  The order also authorizes the United States Attorney's Office "to conduct any discovery needed to identify, locate or dispose of forfeitable property…."[47]  The record in this proceeding, however, does not indicate the United States Attorney's Office has actually identified, located or disposed of forfeitable property, through discovery or other means, other than the two parcels of real property described above.  The government moreover has not, so far as this Court is aware, taken *any* action to recover the transfers at dispute in this case or indeed asserted any claim against the debtor, a separate corporate entity who obviously is *not* Mr. Moore, the person against whom the forfeiture judgment was entered.

Defendant now argues that the trustee lacks standing to pursue the alleged fraudulent transfers because the government has a superior claim to the monies based on the forfeiture judgment.  The defendant's argument however is speculative at best.  The broad language of the forfeiture order was entered against Mr. Moore, not the debtor, and does not extend any relief to property transferred by the debtor to any party, including the defendant.  Moreover, even though the government has actual notice of this bankruptcy case, the government has taken absolutely no action to assert any purported right in the disputed funds.  Indeed, the Chapter 7 trustee specifically spoke with Assistant United States Attorney Michael Lockhard about avoidance claims filed in this case.[48]  According to the trustee, the government disclaimed any interest in pursuing the claims.  The government has not filed a proof of claim or taken action directly against the defendant to recover the disputed funds.  As such, the Court has no valid reason to divest the trustee of his rights

---

[45] Preliminary Forfeiture Order at pp. 3-4.
[46] Preliminary Forfeiture Order at p. 2.
[47] Preliminary Forfeiture Order at pp. 5-6.
[48] Doc. No. 56, ¶¶ 5-6, filed in Adversary Proceeding 10-47.

to pursue avoidable transfers, such as the one raised in this adversary proceeding, when the government shows absolutely no interest in pursuing any such claim.

Defendant's allegation that the government's right to the disputed funds is superior to the trustee's is wholly unsubstantiated.  Until and unless a court, after considering concrete facts, concludes the debtor might not have an interest in the disputed funds or that the government's rights under the forfeiture order usurp the trustee's authority, this adversary will and should proceed in due course.  The trustee's claims therefore remain property of the estate and the trustee's standing in this case is unaffected by the forfeiture order.  Defendant's request for summary judgment on this basis is denied.

In summary, the Court will partially grant the trustee's motion for partial summary judgment to the extent the Court finds the debtor operated a Ponzi scheme and that the debtor was, at the time of the transfers, insolvent, operating with unreasonably small capital, and incurring debts beyond its ability to repay such debts.  The trustee's motion is otherwise denied.  The Court also denies in its entirety the defendant's motion for summary judgment.  A separate order consistent with this memorandum opinion will be entered simultaneously.

DONE AND ORDERED in Orlando, Florida, June 24, 2011.

_____
KAREN S. JENNEMANN
United States Bankruptcy Judge

Copies provided to:

Debtor:  ATM Financial Services, LLC, PO Box 490510, Leesburg, FL 34748

Debtor's Attorney:   Peter Hill, Wolff Hill McFarlin & Herron PA, 1851 W. Colonial Dr., Orlando, FL 32804

Defendant's Attorney:  Phillip S. Smith, McLin & Burnsed PA, 1000 West Main St., Leesburg, FL 34748

Plaintiff:  Soneet R. Kapila, 1000 South Federal Highway, Suite 200, Ft. Lauderdale, FL 33316

Plaintiff's Attorney:  Patrick S. Scott, Gray Robinson, P.A., 401 E. Las Olas Blvd., Suite 1850, Ft. Lauderdale, FL 33301